Case number H11119, Casey v. Toyota. All right, is the appellant ready to proceed? May it please the Court, my name is Chris Ayers, and I'm proud to represent the estate of Donna Marie Casey, her surviving husband, Scott Casey, their two young children, Adia and Liam, and her father, Robert Gills. And it's an honor to be arguing in front of this Court, this is my first time, and I appreciate the invitation. This is a tragic case. Early on the way to take her children to their daycare and school and to her job, Ms. Casey lost control of her vehicle in Fort Worth, and a rollover event ensued. During that rollover event, the safety restraint activated, including her side curtain shield airbag. The rollover ensued, the car rolled multiple times, the glass broke, the side airbag became punctured, and Ms. Casey was ejected underneath the airbag and was crushed by the vehicle during the rollover sequence. She died at the scene. Case proceeded to trial and through pretrial, and the District Court issued a Rule 50 judgment as a matter of law. At the close of plaintiff's evidence on certain claims, two of those issues are presented here for review. First, Issue 1, the District Court should be reversed for its decision that there is legally insufficient evidence to proceed forward on a manufacturing defect. And Issue 2, the District Court should be reversed for its decision that there is legally insufficient evidence to proceed on a design defect concerning the side curtain shield airbag. This Court is well familiar with the Rule 50 standard and I need not restate it in length, but the standard is that there had to have been so strong or overwhelming that a reasonable juror could not arrive at a contrary verdict for the plaintiffs. All inferences are to be rendered in our favor. This is a de novo review where the Court reviews the whole record. I think it's important as we proceed forward to understand that there are two separate sets of rulings by the District Court. First, at the time of the Rule 50 motion, the District Court made oral rulings as to why it was ruling in the manner that it did. Then after the parties stipulated to a dismissal so that an appeal could be perfected, four days later, the District Court issued a written order outlining why it ruled the way it did. In some instances, very differently than what it pronounced from the bench. So both of the District Court's rulings, I think, should be discussed here as the Court could rule on either basis that the District Court ruled. First, it's the manufacturing defect. The parties actually all agree on what the law is here. And in fact, we delivered some bench exhibits to the Court. Behind tab number seven, you will see the parties actually agreed on what the charge to the jury should be as to the manufacturing defect claim. And what the parties said was, as to manufacturing, the jury should be charged as follows, that a manufacturing defect is the failure of one or more of the components of the product or the product itself to, number one, comply with the manufacturer's specification, or, number two, an act or omission in the process of manufacturing, fabricating, or assembling the components or the product itself, such that it renders the product unreasonably dangerous, to an extent not contemplated by an ordinary user. In its original ruling from the bench, the District Court's ruling was that there was adhered to the federal motor vehicle safety standards. That ruling was directly in conflict with the United States Supreme Court's decision in Guyer, which says that those are minimum standards and they are not conclusive. It was in conflict with the Supreme Court's decision in Mercury Marine, the Brokroft case, in which they said that state common law would govern in the absence of a specific federal standard. The parties do not dispute that there is no federal motor vehicle safety standard on-site Curtin Shield airbags, hence state law control. The District Court also said that this was simply an added extra safety feature, which was also contrary to the Texas Civil Practice and Remedies Code. Those were the reasons expressed by the District Court at the Rule 50 motion on the record. Well, what evidence was there of a manufacturing defect? In fact . . . I'm assuming . . . Correct. . . . your point is, is that the court was wrong because there was evidence of a manufacturing defect. Correct. In fact, the District Court's order, both from the bench and in its oral rulings, totally ignored the evidence set forth by the plaintiffs, made no mention of it. And we'll start with Toyota's own 30B6 deposition witness and a non-retained expert, Mr. Shibata. Mr. Shibata stated not once, but twice, that the design standard of Toyota for the side Curtin Shield airbag required it to stay inflated for six seconds, at least six seconds. So, is it . . . this may be mischaracterizing to tell me, but is it your position that that is the failure of any airbag, regardless of the accident context, if it didn't stay inflated for six seconds, that would be per se evidence of manufacturing defect? Correct. If there . . . That's your position? Yes, sir. If the bag fails to stay inflated for six seconds, it has violated the design specification. I'm not asking about whether . . . you're saying that's per se evidence of a manufacturing defect? That's . . . It's a manufacturing defect. The manufacturing defect, as I understand it, requires the plaintiff to put on evidence about how this widget, in this case the airbag, is supposed to be manufactured, what the shop drawings are about how this is supposed to be done, and show how this thing was not done that way. But, as I understand it, I mean, the argument you're making goes to design defect, but it is a manufacturing defect. Respectfully, Judge King, I disagree with that. If you look at the agreed charge, we were supposed to and were required to show under Texas law only that the product failed to adhere to the specification, and Mr. Shibata stated what the specification was, Toyota made the decision that that specification should be a performance . . . Okay. Put the question another way. What's your theory as to how this airbag was different than any other airbag?  The theory is that it didn't perform as it was . . . No, but what's the theory of what aspect of the manufacturing defect existed to make this one different than other ones? Your Honor, it could have been materials. It could have been process. We're not required under Texas law to prove that with any level of that specificity. We're not required to. There's no Texas case that requires that. There's not one single Texas case that says you have to show the specific method and manner in which it failed to comply. All . . . I'm asking you what's your theory as to how it differed as a result of the manufacturing from any other one? That the standard says what it's supposed to do. The standard says that it's supposed to stay inflated in an automobile accident for six seconds and it did not do so. No matter what happens during the accident? Correct. And the best evidence of that, Justice Higginson, is when asked, Mr. Shibata was asked, well, what's the standard for deflation? Okay, so you've told us it has to stay inflated for six seconds. What's the standard for what happens after six seconds? How does it become deflated? And he specifically said, Justice Higginson, we don't have a standard for that. It's too dynamic. I couldn't tell you. The forces are different. He made a qualification as to deflation. He made no such qualification as to the design specification. And he had the opportunity to do so not once, but twice. Okay. Beyond Mr. Shibata, Karambalevich, their retained expert from Exponent, specifically stated, quote, the design specification requires inflation for a minimum of six seconds. Okay. Are you switching to the design? No. This is, again, more evidence as to the manufacturing. She specifically stated that the standard, the design specification requires inflation for six seconds. She also stated that there's no dispute that it probably stayed inflated for approximately two seconds, less than two seconds, the same as Mr. Shibata and others acknowledged. You're telling us that the Texas law, and I'm not, I should be, but I'm not an expert in Texas law, varies, then, from the restatement. Correct. Because the restatement doesn't, does not provide the way you're describing. So you're saying the Texas law on manufacturing defect is different from the restatement. Correct. Grinnell, Ledesma, Ridgeway, all of these cases set forth the exact instruction that we set forth behind tab seven at the record, 1549. Failure of a specification or an act or omission in the process of manufacturing, fabricating, or assembling, one or the other, either way. And we clearly showed, it's undisputed in the record, from Mr. Shibata, from Ms. Bolovich, from Dr. Renfro, all of that. Moreover, the other specification that exists in the case beyond the six seconds is Plaintiff's in its design specifications. That the side curtain shield airbag should remain inflated, and that the head shall not go outside of the vehicle. It is undisputed in this case that it did. So I just want to be clear, because my question was about what evidence was there of a manufacturing defect. And so, are you saying that the sole piece of evidence in connection with your contention that it was a manufacturing defect is that it only stayed inflated for two seconds? Correct. All right. And, according to 2179, her head got outside of the vehicle in conflict with that specification as well. Okay. Switching to the design defect claim, Your Honor, originally, as the court reviewed this, you could see there were, it was a very difficult pretrial. Originally, we were not going to be able to go forward with the design defect claim as to the side curtain shield airbag. Then, in my judgment, the court made the right ruling and said, we're going to let the jury decide this. And then the court granted a Rule 50 motion. The evidence that we brought forward on the design defect claim would be in two parts. The first part would be the testimony of David Renfro. David Renfro is a qualified crash worthiness expert. There's no issue with that here. The court allowed him to go forward. We also brought forward Plaintiff's Exhibit 1198, which is a patent design. In contrary, Your Honors, to what Toyota represents, this was no big change in Dr. Renfro's pretrial versus his trial testimony. This was a time trial. You can read from the record, Dr. Renfro was asked if he had reviewed multiple patents and he said he did. Record 3849. We then approached him and asked him which of the four patents that we had put into proposed exhibits he said would be the best evidence for a jury to look at alternative materials. He looked at those and selected 1198 and his testimony followed. By the way, Plaintiff's Exhibit 1198 was offered into evidence and there was one limited relevance objection that it was not relevant to the opinions that Dr. Renfro was going to offer. That was overruled. Plaintiff's Exhibit 1198 and all that it stands for goes into evidence in full. There's no motion to strike it. There's no additional objections urged. It's in for all purposes. And when you look at it, and when you look at what it says, it shows a proposed alternative design that was tested, that was analyzed, that was technologically feasible, and it was cost effective. Did Renfro compare the proposed design to Toyota's design? Dr. Renfro compared it, his testimony is, compared it to the existing safety system that he knew was in the vehicle and analyzed it. This is not a situation where this is anything more than a change. Your answer is yes, he compared the proposed design to the Toyota design involved in this accident. Correct. His testimony, when you look at the totality of all the work that he did, he undertook a variety of things. He looked at the safety system, he inspected the vehicle specifically, he went through and analyzed. And he put it, he assessed the forces that were involved in this accident as against the proposed design? What he specifically said as to that issue was that this, that this material that would be utilized would be six times stronger. No, but did he apply the forces involved in this accident to the proposed design? His testimony was, unequivocally on the record, if this design had been put into the vehicle, it was his opinion to a reasonable degree of probability she would have remained inside of the vehicle, her head would not have gone underneath, and it would not have punctured. That was his testimony, that she would have survived this accident if this design had been implemented. Okay, so your answer is yes, he considered the forces at play in this accident to come to that conclusion. I'm concerned, being fair to you, Justice Higginson, he didn't use those exact words. That's why I'm trying to explain it. But I think it was, it was stated by him in a different, it was stated by him in a different way other than that specifically. But yes, he analyzed, his testimony was he had analyzed those things, and as applied to this vehicle, if she had been in there, she would have survived. And last question, factually as to the scope of his testimony, did he do a risk utility assessment of the proposed design? He specifically said he had analyzed what the applicants had said, which is permitted, by the way. The patent application? Correct. He said, if you look at the patent applicants, they've looked at the size, for example, normally it blocks at 24 millimeters versus 25. That's in the patent itself, which is substantive evidence. Let's not forget, it's not just what Dr. Renfro says, when that exhibit goes to the jury, they can rely on all aspects of that patent, which we set forth in detail in our brief and our reply brief. But if you look in there, they analyzed all that. They analyzed the material, that it would be more resistant to puncture. They analyzed it could be blocked in such a way, put into the vehicle, that it would be smaller. They saw no problems with its implementation, and that's the question that you have to look at when you examine 1198, which is, is it capable of being implemented? That's the standard. The standard isn't, did he take it and go put it into a vehicle? That is not required under Texas law and the circuit's law. The question is, was it subject to implementation? And when you read the patent, you see that they analyzed all of those issues and determined, yes, this is a perfectly capable, cost-effective, technologically feasible design that could be put into automobiles. I'll reserve the rest of my time for rebuttal. Raffelli? May it please the Court, I am Scott Stolle, representing the Toyota defendants. I want to focus on the two fastest and easiest ways for this Court to affirm. First on the manufacturing claim, because there's no evidence that a manufacturing defect existed. There is no evidence that the vehicle physically deviated from how it was intended and supposed to be built. Secondly, on the design claim, there is no evidence that a safer alternative design exists. 1198 is not a design for an airbag. It's for a fabric to incorporate into an airbag, possibly. It's a concept. There is no comparison to show that that fabric is different from or safer than the Toyota fabric. In fact, Renfro admitted he did no analysis of the risk-utility balancing. Your opponent just said the opposite, so what's the best record site on that? He said, I'm looking for that site, Your Honor. He did say he did no independent evaluation of 1198, and he did no testing. Okay. And what about his statement that, in fact, he did compare the proposed design to Toyota's design? That didn't happen. 1198 describes the baseline material that they tested and the proposed material they tested. The baseline material is described as some type of nylon, but there is no evidence in the record as to how that baseline material compared to Toyota's material. The only evidence is Toyota used nylon 66, but there's no evidence of what the weave was, what the weight of the fabric was, how many layers they used, what kind of coatings they used, what kind of laminates they used. None of that is in the record about the Toyota fabric. So the test that they performed in 1198 is completely irrelevant because it doesn't show how the Toyota fabric compares to the proposed fabric. On your first question, Your Honor, he said at 4001 that he never tested the fabric, that he never put it in a vehicle and did his own analysis. He repeated it to 4001-2 that he did no testing. At 4002, he said he didn't calculate the forces that were imposed on the airbag in the accident. He repeated that at 4002-03, and at 4004-05, he said no, he had not done a risk utility analysis and that he had not done an independent analysis of the application. So as to the manufacturing defect claim, in product liability law, Texas recognizes an manufacturing claim. A design claim is about the choices made in the design process. It's a complaint that you should have done something different in your choices. A manufacturing claim is a claim that the design is safe, but something went awry during the physical assembly of the product. So it's all about something physically went wrong. You have to show a physical deviation from the plans and the specifications. Well, that's not how he's arguing the case, apparently. I asked the question because under the restatement, the restatement is what you've just said, and I said, well, then is the Texas law different? Because he's talking about there's some kind of a specifications variance that this didn't comply with the specifications, and I don't understand. Under Texas law, is that a permissible manufacturing defect case? No, it is not, Your Honor. I don't believe Texas law differs from the restatement, and you can look at some of the cases we cited in the brief, the Vic Penn case from the Supreme Court, Carter v. Massey Ferguson, which is from this court, where the court said a manufacturing defect is when the product is not in the intended condition because of an error in the manufacturing process. That's what this court said. Same thing in Green v. R.J. Reynolds. This court said in manufacturing cases, the product does not conform to the manufacturer's specifications. What he apparently is saying, and he can correct me on rebuttal if I'm wrong, what he's saying is, well, this thing didn't come out, so to speak, of the manufacturing process complying with the design specs, so there must have been a problem in the manufacturing process. But he seems to say just the fact that it didn't comply with the specs that Toyota had for its widget here means that there must have been a manufacturing defect. Well, he seems to say just the fact that it didn't comply with its own specs equals manufacturing defect. And what they're relying on is what they allege is a performance standard. There is no Texas law that says you can use a performance standard as the basis for a manufacturing defect. Yeah, that's the claim. Yes. Performance standard. Yes. And the problem with their claim there is they're blurring this distinction between manufacturing defect and design defect. The true import of what they're claiming here is that Toyota didn't make the right choices in the design in order to create a bag that would stay inflated for six seconds under all conditions, under any possible accident that could ever occur. That's a design claim. So they offered no evidence that there's a physical deviation from how the product was supposed to be built from the manufacturer's plans and specifications. For example, they don't argue that there's a flawed seam in the airbag. It wasn't sewn properly or it wasn't sealed properly and that allowed air to escape too soon. So the state of the record is the airbag was built exactly how Toyota intended it. And as a result, they do not have a manufacturing claim. Now the natural consequence of that is they are left solely with a design claim, which is really the true import of their claim. And because they're solely left with a design claim, that claim has to be tested against the elements of a design claim, not against the elements of a manufacturing claim. One final point on manufacturing defect that touches on a question from Judge King is essentially what the plaintiffs are saying here is there must be a manufacturing defect in there somewhere since the airbag abraded and lost pressure. There's got to be something wrong with it. Yeah, but I don't think that's how you prove a manufacturing defect claim. It isn't, Your Honor. And Texas law is very clear. Two cases I can cite, Ford Motor v. Ridgeway and Ford Motor v. Ledesma, the Supreme Court says you have to identify the defect. You cannot just throw out there some undifferentiated, quote, condition that you say made the product unreasonably dangerous. So Texas law is clear. You cannot draw the inference of an accident merely from the fact that, or I'm sorry, of a product defect merely from the fact that an accident occurred. You have to have more than an accident and an injury in order to establish a defect. And that's essentially what they're arguing here is just because the airbag abraded, that must mean there's something wrong in there. We can't tell you what it is, but there's something wrong. And as a result, we can imply a defect from that. And Texas law does not allow that implication. So again, that just leaves us with the design claim. The plaintiffs say that 1198, PX 1198 shows the safer alternative. That is a patent application in which the authors hypothesized that they have somehow invented a fabric that is more abrasion resistant than the baseline fabric they tested. What they didn't do is they didn't test the Toyota airbag material. Because there's nothing to demonstrate in the record what the Toyota airbag material is in total. And so 1198 is not a comparison of their proposed fabric against the Toyota fabric. Another thing that is important is the fabric they tested in 1198 was that they filed this patent application in 2004. So the testing had to be in 2004 or earlier. This vehicle was made in 2010. So there's been no evidence in the record of what, if any, differences from quote standard, whatever that is, occurred in that six-year interval. So we have no basis in the record to say the Toyota airbag is the same as the baseline that they tested in 1198. Renfro himself admitted he did no testing. And of any kind, let alone a testing to compare the proposed fabric against the Toyota fabric. So there is no evidence that the fabric in 1198 is better, worse, or the same as Toyota with respect to abrasion resistance. As a result, there's no evidence a safer alternative even exists. Now a related point confirms this. Renfro admitted he did no calculation of how much force was imposed on the airbag in the accident. He said he had no quarrel with other experts who said the force was 22 times the force of the drop test that was conducted by the authors of 1198. So as a result of him having no testing, he's got no way to say that an airbag using the fabric in 1198 would have performed better than the Toyota fabric. There's no way, even if you could incorporate that fabric into a workable airbag, there's no evidence it would have performed better. Renfro had no way to know that because he did no testing, he did no calculations. The record is inconclusive as to what the speed of the vehicle was at the time of the accident, or is that wrong? No, when it hit that culvert and launched, it was at approximately 62 miles an hour. Okay, so that is in the record. Yes. You had a separate argument on the design defect relating to if it's an extra safety measure. Yes. Are you pursuing that argument? And if so, what's your best authority that you could never have something unreasonably dangerous if it were an extra measure? Well, I think the, I can't point you to a case when you ask for authority, but I think I can explain that argument in three easy steps, Your Honor. The first step is that the object of product's liability law is to impose liability when a product is unreasonably dangerous. To do that, you have to determine what is the risk at issue in the case. In this case, it's the risk of a driver being ejected through the side window. So you have to focus on, is that risk unreasonably dangerous? That's step one. Step two, what is the baseline level of that risk? Is it an unreasonably dangerous risk? And to do that, you have to look at the level of the risk and you have to look at a comparison against the gravity and the severity of the potential injury. There is no evidence in this record to demonstrate that that baseline risk, which is there, it's inherent in the vehicle, but there's no evidence that baseline risk exceeds the threshold to make it unreasonable when you compare . . . To make what unreasonable? To make the product unreasonable? The vehicle? Yes. Is that what you're talking about? To make the vehicle unreasonably dangerous because the gravity and potential likelihood of injury exceeds the utility of the product. And so if I understood Judge Higginson's question, and I may not have, but I thought he asked about your contention, and it may not be your contention, that you could never render a product unreasonably dangerous by adding a feature that's not some kind of required feature on the vehicle. And otherwise, you can't take a vehicle that is not unreasonably dangerous and render it unreasonably dangerous by adding some extra feature. That's not your contention. That's not what we're arguing. All right. That's the plainest mischaracterization of total injury. So to get . . . and the third step explains this, Your Honor. So to get to the third step, when there's no evidence that the baseline is unreasonably dangerous, the risk of ejection without a curtain shield airbag, when you add the curtain shield airbag, it does not increase that baseline risk because that airbag is designed to reduce that risk. It could never increase that risk. And as a result, the airbag without . . . sorry, the vehicle without that airbag is not unreasonably dangerous. It can't be unreasonably dangerous with the airbag. Now, it would be different . . . As regards the risk of being ejected through the window. Exactly. Exactly. All right. It would be different if it was a different kind of risk. Because I'm thinking, for example, they could have a feature for environmental reasons that allows that the car . . . the engine stops running if the vehicle is immobile for a few seconds. You're at a red light or something. And then the engine starts up again when you touch the accelerator. But then you're on the freeway, and this feature that kills the engine kills it in the middle of 70 miles an hour on the freeway. And so it's a feature that's not required to be on the vehicle, but it could render that vehicle unreasonably dangerous if it malfunctioned. Because that feature is adding the risk that's at issue. All right. The analogy would be with the airbag, if it was an inflation-induced injury, the introduction of an airbag into the vehicle creates that risk. It could become an unreasonably dangerous cause. We don't need to go this direction, and there isn't authority. It's an interesting argument. It would resolve this case, but you aren't saying that we need to reach it. That's correct. That's correct. You can reach the affirmance on manufacturing defect because there's no evidence that a defect existed, and on design defect because there's no evidence of a safer alternative. That's correct. And you would not have to reach this argument about unreasonable danger. So on the safer alternative, I think I was at the point of mentioning that Renfro had no way to know that the forces that were imposed in this accident, he didn't calculate them, he didn't determine them. He had no way to say that the proposed airbag in 1198 would have withstood those forces. Basically, you know, you have to, under Texas law, do a risk-utility analysis. Would the product have prevented or substantially reduced the risk of injury without substantially impairing the product's utility? And Renfro didn't go through that analysis, and neither did the authors of 1198. The authors of 1198 simply created a preliminary concept, which this Court has recognized in multiple cases. I think Smith v. Louisville-Ladder is one of them, the Guy case, the Watkins case, that a preliminary concept is not a safer alternative. That doesn't rise to the level. So there was no testing calculations or independent evaluation of any kind to show that this would have been a safer alternative, and they never showed that even this alternative could be actually engineered into an airbag. It's just one component of an airbag, a fabric, and all they did was build a two-liter size bag in their abrasion testing. That's the size of a large Coke bottle. That's all they tested. They didn't do the analysis to determine, could it actually work when made full size and put into an airbag? Will it inflate properly at the right time in the right sequence with the right force? Will it deflate? Because part of an airbag is it's got to deflate. That's part of the cushioning effect when the body hits the airbag. In my final two minutes, I want to mention what I think are the four most important takeaways. One is there's no evidence of a physical deviation from how the product was supposed to be built compared to the plans and specifications. This is required by Texas law to prove a manufacturing claim. A performance standard cannot establish that. That's number one. Number two, there is no comparison to show that the proposed fabric in 1198 is safer than the Toyota airbag fabric. The test in 1198 was against some, quote, standard that has not been shown to be the same as the Toyota fabric. Number three, there's no analysis of the forces in this accident to show that the proposed fabric would have made a difference, that it would have somehow performed better and not been overwhelmed by the tremendous force of this two and three quarter rollover. And fourthly, 1198 is not a design for an airbag. There is no showing that that fabric could actually be engineered into a workable airbag. They said they did things such as consider how it would be packed and blocking. Blocking is, will it stick together as it unfurls? They said, but there's no evidence in 1198 they did any of those things. They talked about them, but no evidence they did them. So in conclusion, we ask that the court affirm on the manufacturing claim there is no evidence of a manufacturing defect. We ask that you affirm on the design claim because there is no evidence of a safer alternative. Thank you. Rebuttal. Justice Higginson, one of the questions you asked was whether or not Dr. Renfro had compared, and you wanted the best record site about if he had compared what's in the vehicle versus what's proposed. Record at 38, I believe it's 3851, I have the reporter's record here, I believe it's 3851 to 3852. Talking about the patent, question, okay, and we know that there's material called nylon 66 in this car. This is different type of material, is that fair? That's correct. He specifically said nylon 66 is in the Highlander and the patent is introducing different new material, and then he goes on to discuss it. On the manufacturing defect claim, the contention has been made over and over again by Toyota that we have not shown any physical deviation, although if you read the brief, there's of course no case site to that requirement because it doesn't exist, but if it did, we've shown it. We've shown it's undisputed that this bag was punctured and abraded all over the bag, and it's undisputed that physically it did not retain its inflation pressure for six seconds. So, although not required under Texas law, and there's no cases requiring that, we've done it anyway. The court should also be mindful this issue about, well, you have to show that it's a one-off deviation. What you're saying basically is so the product failed under the circumstances here, so there must have been a manufacturing defect. This is not . . . I am not taking the position, we are not, that this is . . . Ledesma and Ridgeway are the cases that say bad result alone will not suffice. That's the Texas gloss, that's the case law, to your point, Judge King. This is not bad result alone. This is taking the undisputed design specification outlined by Toyota's 30B6 deponent and its experts, coupling it with the physical evidence . . . What you're saying, though, I understand it. The bag is supposed to stay inflated for six seconds. Correct. It didn't. Yes, ma'am. Therefore, there was a manufacturing defect. Correct. It failed to adhere to that specification. I don't think you can show a manufacturing defect in that fashion. I think you have to show something about the process by which the thing was manufactured and something went wrong. I mean, what's your best Texas case for saying the product failed to, how would you say it, be consistent with what it was supposed to do, therefore, there was a manufacturing defect? All of the cases outline the law that we put forward in the jury charge, from Grinnell all the way through Ledesma and Ridgeway, that you have two ways to prove it. Showing a failure of the specification or showing that there was an error or omission during manufacturing, fabricating, or assembling. Either one will suffice. That's how the jury was to be charged. That's what the parties agreed to try the lawsuit on that basis, if you look at the We do differ from the restatement. By the way, the jury charge, was there a pre-trial conference where everyone agreed as to the jury charge or was that? His pre-trial order required us to get together and work on the instructions and submit what we could agree to or what was objected to. And that had been done? Correct. And it's submitted and it's in the record. It's 1549. So what you're telling me then is that if I look at the record, the jury charge, which has been agreed to by both parties, will show that this is a viable theory of your case? Yes, ma'am. And the cases you're citing for that will say Texas is different than the restatement or is that your inference from that? That's what I believe to be accurate. If you look at Ledesma and if you look at Grinnell, they set forward what the Texas standard is. In fact, if you look at the footnote, Judge King and Judge Higginson, on 1549, you'll see that we cited the pattern jury charge and Ledesma because Ledesma had come out after the pattern jury charge. So we specifically crafted this question that was to go to the jury by agreement in accordance with the most recent Texas precedent. So this is the Texas pattern jury charge, which is what you'd use? Correct. Along with the Ledesma case because it had changed, we had put some unreasonably dangerous language into that definition. And I guess I'm assuming there's evidence in the record about what happened to the vehicle from the time of purchase to the time of the accident. There was no alteration, no intervening event that could have affected the way the side airbag functioned. All of that's in the record. Correct. There were very limited miles. This thing had only been out a matter of months. Just like I'll concede that it was approximately 62 miles an hour. There was no dispute about alteration of the product or anything like that. I'd like to conclude just very briefly if I could. What you've heard here today are two very different versions of what the evidence is. Very different. And that's why this court, district court, had it right. Which is just like the Riley court, just like this court has said over and over in Two Rivers, Raytheon, all of those cases. The way to solve this is by vigorous cross-examination, presenting your version of the case and instructing the jury. It's not for judges to weigh the credibility and weight to be given to evidence. That is a matter for the trier of fact, who was not the district court in this case. Respectfully, he had it right and then he erred by granting judgment as a matter of law and we would request the court reverse on both issues. All right. Thank you very much. The court will take this matter under advisement, render a ruling in due course.